books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) **Payments**. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Purchasers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement); provided that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day and, in the case of any Interest Date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of Interest due on such date. Any amount of Principal or other amounts due under the Transaction Documents, other than Interest, which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of eighteen percent (18%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(26) **CANCELLATION**. After all Principal, accrued Interest and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(27) **WAIVER OF NOTICE**. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(28) **GOVERNING LAW**. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. In the event that any provision of this Note is invalid or unenforceable under any applicable

statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(29)   CERTAIN DEFINITIONS. For purposes of this Note, the following terms shall have the following meanings:

(a)   "**Approved Stock Plan**" means any employee benefit plan which has been approved by the Board of Directors of the Company, pursuant to which the Company's securities may be issued to any employee, consultant, officer or director for services provided to the Company.

(b)   "**Average Market Price**" means, for any given date, the arithmetic average of the Weighted Average Price of the Common Stock during the ten (10) consecutive Trading Day period ending on the third (3rd) Trading Day immediately prior to such given date, as appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction that proportionately decreases or increases the Common Stock during such period.

(c)   "**Bloomberg**" means Bloomberg Financial Markets.

(d)   "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(e)   "**Calendar Quarter**" means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(f)   "**Change of Control**" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock or business combination in which the Company is the publicly traded surviving entity in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification or business combination continue after such reorganization, recapitalization or reclassification or business combination to hold publicly traded securities and, directly or indirectly, the voting power of the surviving entity or entities necessary to elect a majority of the members of the board of directors (or their equivalent if other than a corporation) of such entity

27

or entities (except where Apollo Resources International or its affiliates becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 70% or greater of the aggregate Voting Stock of the Company), or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(g) "**Change of Control Consideration**" means, for any Change of Control, an amount, if any, equal to the sum of the aggregate cash consideration and the aggregate cash value of any marketable securities per share of Common Stock to be paid to the holders of the Common Stock upon consummation of such Change of Control, with any such non-cash consideration to be valued at the higher of the Closing Sale Price of such securities as of the Trading Day immediately prior to the consummation of the Change of Control, the Closing Sale Price on the Trading Day immediately following the public announcement of such proposed Change of Control and the Closing Sale Price of on the Trading Day immediately prior to the public announcement of such proposed Change of Control.

(h) "**Change of Control Redemption Premium**" means (i) for Change of Control Notice delivered or required to be delivered in connection with a Change of Control prior to the third (3rd) anniversary of the Issuance Date, 125% and (ii) for any Change of Control Notice delivered or required to be delivered in connection with a Change of Control following the third (3rd) anniversary of the Issuance Date, 115%; provided, however, that, in connection with any Change of Control in which the Change of Control Consideration equals or exceeds $8.00 per share, then the Change of Control Redemption Premium shall equal 100%.

(i) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 24. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

28

(j)     "**Closing Date**" shall have the meaning set forth in the Securities Purchase Agreement, which date is the date the Company initially issued Notes pursuant to the terms of the Securities Purchase Agreement.

(k)     "**Common Stock Deemed Outstanding**" means, at any given time, the number of shares of Common Stock outstanding at such time, plus the number of shares of Common Stock deemed to be outstanding pursuant to Sections 7(a)(i) and 7(a)(ii) hereof regardless of whether the Options or Convertible Securities are actually exercisable at such time, but excluding any Common Stock owned or held by or for the account of the Company or issuable upon conversion or exercise, as applicable, of the Notes and the Warrants.

(l)     "**Company Conversion Price**" means, the lower of (i) the applicable Conversion Price and (ii) that price which shall be computed as 90% of the arithmetic average of the Weighted Average Price of the Common Stock on each of the five (5) consecutive Trading Days immediately preceding the applicable Installment Date (each such period, a "**Company Conversion Measuring Period**"). All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction during such Company Conversion Measuring Period.

(m)     "**Consolidated Net Income**" means, for any applicable period, the net income (loss) of the Company and its Subsidiaries for such period, determined on a consolidated basis and in accordance with GAAP, but excluding from the determination of Consolidated Net Income (without duplication) (a) any extraordinary or non recurring gains or losses or gains or losses from Dispositions, (b) restructuring charges, (c) any tax refunds, net operating losses or other net tax benefits, (d) effects of discontinued operations and (e) interest income (including interest paid-in-kind).

(n)     "**Consolidated Net Interest Expense**" means, for any applicable period, gross interest expense of the Company and its Subsidiaries for such period determined on a consolidated basis and in accordance with GAAP, less (i) the sum of (A) interest income for such period and (B) gains for such period on Hedging Agreements (to the extent not included in interest income above and to the extent not deducted in the calculation of gross interest expense), plus (ii) the sum of (A) losses for such period on Hedging Agreements (to the extent not included in gross interest expense) and (B) the upfront costs or fees for such period associated with Hedging Agreements (to the extent not included in gross interest expense), in each case, determined on a consolidated basis and in accordance with GAAP.

(o)     "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

29

(p) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for Common Stock.

(q) "**EBITDA**" means, with respect to any Person and its Subsidiaries for any applicable Fiscal Quarters, the Consolidated Net Income of such Person and its Subsidiaries as set forth in the financial statements of the Company contained in the Form 10-QSB or Form 10-KSB of the Company for the applicable Fiscal Quarter, *plus* without duplication, the sum of the following amounts of the Company and its Subsidiaries for such period to the extent deducted in determining Consolidated Net Income of such Persons for such period: (i) Consolidated Net Interest Expense, (ii) income tax expense, (iii) depreciation expense and (iv) amortization expense.

(r) "**EBITDA Threshold**" means:

(i) (A) $30.0 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending December 31, 2007 or (B) $27.5 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending December 31, 2007 with at least $10.0 million in EBITDA reported for the Fiscal Quarter ending December 31, 2007;

(ii) $35.0 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending March 31, 2008 or $11.5 million in EBITDA reported for the Fiscal Quarter ending March 31, 2008;

(iii) $45.0 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending June 30, 2008 or $17.5 million in EBITDA reported for the Fiscal Quarter ending June 30, 2008;

(iv) $50.0 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending September 30, 2008 or $17.5 million in EBITDA reported for the Fiscal Quarter ending September 30, 2008; and

(v) $60.0 million of LTM Consolidated EBITDA reported for the Fiscal Quarter ending December 31, 2008 or $25.0 million in EBITDA reported for the Fiscal Quarter ending December 31, 2008.

(s) "**Eligible Market**" means the Principal Market, The New York Stock Exchange, Inc., the American Stock Exchange, the Nasdaq National Market or the Nasdaq Capital Market.

(t) "**Equity Conditions**" means that each of the following conditions is satisfied: (i) on each day during the period beginning three (3) months prior to the applicable date of determination and ending on and including the applicable date of determination (the "**Equity Conditions Measuring Period**"), either (x) the Registration Statement filed pursuant to the Registration Rights Agreement shall be effective and available for the resale of all remaining Registrable Securities in accordance with the terms of the Registration Rights Agreement and there shall not have been for the one (1) month period ending on and including the date immediately preceding the applicable date of determination any Grace Periods (as defined in the

30

Registration Rights Agreement) or (y) all shares of Common Stock issuable upon conversion of the Notes and exercise of the Warrants shall be eligible for sale without restriction and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market or any other Eligible Market and shall not have been suspended from trading on such exchange or market (other than suspensions of not more than two (2) days and occurring prior to the applicable date of determination due to business announcements by the Company) nor shall delisting or suspension by such exchange or market been threatened or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market; (iii) during the Equity Conditions Measuring Period, the Company shall have delivered Conversion Shares upon conversion of the Notes and Warrant Shares upon exercise of the Warrants to the holders on a timely basis as set forth in Section 3(c)(ii) hereof (and analogous provisions under the Other Notes) and Section 2(a) of the Warrants; (iv) any applicable shares of Common Stock to be issued in connection with the event requiring determination may be issued in full without violating Section 3(d) hereof and the rules or regulations of any applicable Eligible Market; (v) for the two (2) Calendar Quarters immediately preceding the applicable date of determination, the Company shall not have failed to timely make any payments within five (5) Business Days of when such payment is due pursuant to any Transaction Document; (vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction which has not been abandoned, terminated or consummated, or (B) an Event of Default or (C) an event that with the passage of time or giving of notice would constitute an Event of Default; (vii) the Company shall have no knowledge of any fact that would cause (x) the Registration Statements required pursuant to the Registration Rights Agreement not to be effective and available for the resale of all remaining Registrable Securities in accordance with the terms of the Registration Rights Agreement or (y) any shares of Common Stock issuable upon conversion of the Notes and shares of Common Stock issuable upon exercise of the Warrants not to be eligible for sale without restriction pursuant to Rule 144(k) and any applicable state securities laws; and (viii) during the six (6) month period ending on and including the date immediately preceding the applicable date of determination, the Company otherwise shall have been in material compliance with and shall not have materially breached any provision, covenant, representation or warranty of any Transaction Document.

(u) "**Equity Conditions Failure**" means that (i) on any day during the period commencing ten (10) Trading Days prior to the applicable Conversion Date through the applicable Share Delivery Date, (ii) on any day during the period commencing ten (10) Trading Days prior to the applicable Company Installment Notice Date through the applicable Installment Date or (ii) on any day during the period commencing ten (10) Trading Days prior to the applicable Mandatory Conversion Notice Date through the applicable Mandatory Conversion Date, the Equity Conditions have not been satisfied (or waived in writing by the Holder).

(v) "**Equity Value Redemption Premium**" means (i) for any Change of Control Notice or Event of Default Notice, as applicable, delivered or required to be delivered in connection with a Change of Control or Event of Default, as applicable, prior to the third (3rd) anniversary of the Issuance Date, 115% and (ii) for any Change of Control Notice or Event of Default Notice, as applicable, delivered or required to be delivered in connection with a Change

31

of Control or Event of Default, as applicable, following the third (3rd) anniversary of the Issuance Date, 110%; provided, however, that, in connection with any Change of Control in which the Change of Control Consideration equals or exceeds $8.00 per share, then the Equity Value Redemption Premium shall equal 100%.

(w) "**Excluded Securities**" means any Common Stock issued or issuable: (i) in connection with any Approved Stock Plan; (ii) upon conversion, adjustment or redemption of the Notes or the exercise of the Warrants; (iii) pursuant to a bona fide firm commitment underwritten public offering with a nationally recognized underwriter which generates gross proceeds to the Company in excess of $50,000,000 (other than an "at-the-market offering" as defined in Rule 415(a)(4) under the 1933 Act and "equity lines"); (iv) in connection with any acquisition by the Company, whether through an acquisition of stock or a merger of any business, assets or technologies the primary purpose of which is not to raise equity capital; (v) in connection with any other strategic transaction or alliance the primary purpose of which is not to raise equity capital including without limitation, the issuance of no more than 10,000,000 shares of Common Stock to agricultural conglomerates and (vii) upon conversion or exercise of any Options or Convertible Securities which are outstanding on the day immediately preceding the Subscription Date, provided that the conversion or exercise price of such Options or Convertible Securities is not amended, modified or changed on or after the Subscription Date.

(x) "**First Conversion Threshold Conversion Amount**" means an amount equal to (x) 50% of the Conversion Amount of this Note on the Issuance Date <u>minus</u> (y) the aggregate Conversion Amount of this Note converted or redeemed pursuant to the terms of this Note.

(y) "**Fiscal Quarter**" means each of the fiscal quarters adopted by the Company for financial reporting purposes that correspond to the Company's fiscal year that ends on December 31, or such other fiscal quarter adopted by the Company for financial reporting purposes in accordance with GAAP.

(z) "**Fundamental Transaction**" means that the Company shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person or Persons, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company to another Person, or (iii) allow another Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of the outstanding shares of Voting Stock (not including any shares of Voting Stock held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than the 50% of the outstanding shares of Voting Stock (not including any shares of Voting Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination), or (v) reorganize, recapitalize or reclassify its Common Stock, or (vi) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) (other than Apollo Resources International) is or shall become the "beneficial owner" (as defined in Rule 13d-3

32

under the Exchange Act), directly or indirectly, of 50% of the aggregate Voting Stock of the Company, or (vii) Apollo Resources International ceases to be the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of at least 50% of the aggregate Voting Stock of the Company, or (viii) Apollo Resources International or its affiliates becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 70% or greater of the aggregate Voting Stock of the Company.

(aa) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(bb) "**Holder Pro Rata Amount**" means a fraction (i) the numerator of which is the Principal amount of this Note on the Closing Date and (ii) the denominator of which is the aggregate principal amount of all Notes issued to the initial purchasers pursuant to the Securities Purchase Agreement on the Closing Date.

(cc) "**Indebtedness**" of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(dd) "**Installment Amount**" means with respect to any Installment Date, the lesser of (A) the product of (i) $27,777.77, *multiplied* by (ii) Holder Pro Rata Amount and (B) the Principal amount under this Note as of such Installment Date, as any such Installment Amount may be reduced pursuant to the terms of this Note, whether upon conversion, redemption or otherwise, together with, in each case the sum of any accrued and unpaid Interest with respect to such Principal amount and accrued and unpaid Late Charges, if any, with respect to such Principal amount and Interest. In the event the Holder shall sell or otherwise transfer any portion of this Note, the transferee shall be allocated a pro rata portion of the each unpaid Installment Amount hereunder.

33

(ee) "**Installment Date**" means each of the following dates: (i) March 31, 2007, (ii) June 30, 2007, (iii) September 31, 2007, (iv) December 31, 2007, (v) March 31, 2008, (vi) June 30, 2008, (vii) September 31, 2008, (viii) December 31, 2008, (ix) March 31, 2009, (x) June 30, 2009, (xi) September 31, 2009, (xii) December 31, 2009, (xiii) March 31, 2010, (xiv) June 30, 2010, (xv) September 31, 2010, (xvi) December 31, 2010, (xvii) March 31, 2011 and (xviii) the earlier of the Maturity Date and June 30, 2011.

(ff) "**Installment Volume Limitation**" means 15% of the aggregate dollar trading volume (as reported on Bloomberg) of the Common Stock on the Principal Market over the forty (40) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable Installment Notice Date.

(gg) "**Interest Rate**" means, initially eight percent (8.0%) per annum, subject to adjustment at the beginning of each Calendar Quarter beginning with the Calendar Quarter ended March 31, 2007 in the event that the Interest Rate Conditions are satisfied as of the applicable Calendar Quarter, then in which case the Interest Rate shall equal six percent (6.0%) per annum thereafter.

(hh) "**Interest Rate Conditions**" means that (i) the Equity Conditions are presently satisfied (or waived in writing by the Holder) and (ii) the Company has reported LTM Consolidated EBITDA in excess of $40,000,000.

(ii) "**Letter of Credit Amount**" means, as of any date of determination, an amount equal to 30% of the aggregate Principal Amount outstanding under the Notes.

(jj) "**LTM Consolidated EBITDA**" means, with respect to any Person, the aggregate Consolidated Net Income of such Person and its Subsidiaries for the current Fiscal Quarter and the immediately preceding three (3) Fiscal Quarters but only if and as set forth in the financial statements of the Company contained in the Form 10-QSB or Form 10-KSB of the Company; plus without duplication, the sum of the following amounts of such Person and its Subsidiaries for such period and to the extent deducted in determining Consolidated Net Income of such Person for such period: (i) Consolidated Net Interest Expense, (ii) income tax expense, (iii) depreciation expense, and (iv) amortization expense.

(kk) "**Make-Whole Amount**" means, as to any Conversion Amount being converted pursuant to Section 3(c) or pursuant to Section 9, an amount equal to the difference between (i) an amount of Interest that, but for the applicable conversion, would have been paid to the Holder on such Conversion Amount from the Issuance Date through the third (3rd) anniversary of the Issuance Date and (ii) the amount of Interest already paid to the Holder from the Issuance Date through the Conversion Date or Mandatory Conversion Date, as applicable with respect to that Conversion Amount.

(ll) "**Make-Whole Conversion Price**" means that price which shall be the lower of (i) the applicable Conversion Price and (ii) the price computed as 90% of the arithmetic average of the Weighted Average Price of the Common Shares during the five (5) consecutive Trading Day period ending on the Trading Day immediately preceding the

34

Conversion Date or Mandatory Conversion Notice Date, as applicable (each, a "**Make-Whole Conversion Measuring Period**"). All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction during such Make-Whole Conversion Period.

(mm) "**Mandatory Conversion Volume Limitation**" means 25% of the aggregate dollar trading volume (as reported on Bloomberg) of the Common Stock on the Principal Market over the thirty (30) consecutive Trading Day period prior to the applicable Mandatory Conversion Notice Date.

(nn) "**Net Cash Balance**" means, at any date, (i) an amount equal to the aggregate amount of cash, cash equivalents (including cash collateralizing the Letter of Credit and not including other restricted cash) and marketable securities, consisting of corporate bonds, commercial paper and medium-term notes, as shown or reflected in the notes to the Company's consolidated balance sheet as at such date *minus* (ii) the unpaid principal balance of any Indebtedness for borrowed money (excluding Indebtedness under the Notes and accounts payable).

(oo) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(pp) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(qq) "**Permitted Indebtedness**" means (i) from the Issuance Date through December 31, 2007, total Indebtedness of the Company not to exceed $77.5 million in the aggregate outstanding at any one time; (ii) on and after January 1, 2008, total aggregate Indebtedness of the Company that does not as of the date on which any such Indebtedness is incurred, or as of the end of any Fiscal Quarter, exceed 3.0x LTM Consolidated EBITDA; provided, however, that such Indebtedness permitted pursuant to clauses (i) and (ii) hereof, shall be made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement acceptable to the Required Holders and approved by the Required Holders in writing, and which Indebtedness does not provide at any time for (A) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (B) total interest and fees at a rate in excess of the initial Interest Rate per annum; (iii) Indebtedness of the Company outstanding as of the date hereof, and Indebtedness of any Subsidiary that is non-recourse to the Company or any other Subsidiary; (iv) Indebtedness incurred in connection with the build up of a Shell terminal which Indebtedness shall not exceed twenty percent (20.0%) of the total cost of such build up project and which Indebtedness may only be secured by such Shell terminal being financed; (v) Indebtedness represented by that certain municipal bond financing for the Company's facility in Bell Chase, Louisiana which Indebtedness shall be non-recourse to the Company, (vi) the Indebtedness evidenced by this Note and the Other Notes.

35

(rr) "Permitted Liens" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (v) Liens (A) upon or in any equipment (as defined in the Security Agreement) acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens on Permitted Indebtedness of the type described in clauses (iii) and (iv) of the definition thereof; (vi) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (i) and (v) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vii) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (viii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, and (ix) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(ix).

(ss) "Person" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(tt) "Principal Market" means the OTC Bulletin Board.

(uu) "Redemption Premium" means (i) in the case of the Events of Default described in Section 4(a)(i) - (vi) and (ix) - (xii), 120% or (ii) in the case of the Events of Default described in Section 4(a)(vii) - (viii), 100%.

(vv) "Registration Rights Agreement" means that certain registration rights agreement dated as of the Subscription Date by and among the Company and the initial holders of the Notes relating to, among other things, the registration of the resale of the Common Stock issuable upon conversion of the Notes and exercise of the Warrants.

(ww) "Required Holders" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding.

(xx) "Reserved Amount" means, as of any date of determination, an amount equal to 35% of the aggregate Principal amount outstanding under all of the Notes.

36

(yy) "**SEC**" means the United States Securities and Exchange Commission.

(zz) "**Securities Purchase Agreement**" means that certain securities purchase agreement dated as of the Subscription Date by and among the Company and the initial holders of the Notes pursuant to which the Company issued the Notes and Warrants.

(aaa) "**Subscription Date**" means August 11, 2006.

(bbb) "**Successor Entity**" means the Person, which may be the Company, formed by, resulting from or surviving any Fundamental Transaction or the Person with which such Fundamental Transaction shall have been made, provided that if such Person is not a publicly traded entity whose common stock or equivalent equity security is quoted or listed for trading on an Eligible Market, Successor Entity shall mean such Person's Parent Entity.

(ccc) "**Trading Day**" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded; provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York Time).

(ddd) "**Voting Stock**" of a Person means capital stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

(eee) "**Warrants**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all warrants issued in exchange therefor or replacement thereof.

(fff) "**Weighted Average Price**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" functions, or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of

37

the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and the Required Holders. If the Company and the Required Holders are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 24. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(30) DISCLOSURE. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within two (2) Business Days after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries. In the event of a breach of the foregoing covenant by the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees and agents, in addition to any other remedy provided herein or in the Transaction Documents, a Holder shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Company, its Subsidiaries, or any of its or their respective officers, directors, employees or agents. No Holder shall have any liability to the Company, its Subsidiaries, or any of its or their respective officers, directors, employees, stockholders or agents for any such disclosure.

[Signature Page Follows]

38

http://www.sec.gov/Archives/edgar/data/1268471/000110465906076...

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

**EARTH BIOFUELS, INC.**

By: /s/ Dennis G. McLaughlin, III
    Name: Dennis G. McLaughlin, III
    Title: Chief Executive Officer